# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ALBERTO CABRERA DE LA MATA**, *et al.*,

      Plaintiffs,

      v.

**PUERTO RICO HIGHWAY AND
TRANSPORTATION AUTHORITY**, *et al.*,

      Defendants.

Civil No. 10-1759 (BJM)

## OPINION AND ORDER

In an amended complaint, Alberto Cabrera de la Mata ("Cabrera"), his wife Maribel Rivera Pacheco ("Rivera"), and their conjugal partnership (collectively, "plaintiffs") sued the Puerto Rico Highway and Transportation Authority ("PRHTA"), Rubén Hernández Gregorat ("Hernández") in his personal and official capacities as Secretary of the Department of Transportation and Public Works, Brenda Gomila Santiago ("Gomila") in her personal and official capacities as Executive Director of Human Resources, Lillian Carrasco ("Carrasco") in her personal and official capacities as Special Aide to the Secretary, Ferdinand Cedeño ("Cedeño") in his personal and official capacities as Special Aide to the Secretary (collectively, "defendants"), and an unnamed insurance company.  (Docket No. 24, hereinafter "Compl."). Cabrera alleges that he was subjected to retaliation because of his allegiance to the Popular Democratic Party ("PDP") following the installation of New Progressive Party ("NPP") leadership in the wake of the 2008 gubernatorial election.  Cabrera alleges that this deprived him of his rights to free speech, free association, equal protection, and due process under the federal Constitution, in violation of 42 U.S.C. § 1983 ("Section 1983"), as well as rights under the Commonwealth constitution, Law No. 184 of August 3, 2004 ("Law 184"), 3 L.P.R.A. §§ 1461 *et seq.*, Law No. 100 of June 26, 1956 ("Law 100"), 29 L.P.R.A. §§ 146 *et seq.*, and Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141, 5142.  Rivera and the conjugal partnership allege that they suffered damages based on having to "witness the anxiety

and anguish this situation has had" on Cabrera.

Before the court is defendants' motion for summary judgment on all claims. (Docket No. 67).  Plaintiffs opposed the motion.  (Docket Nos. 84, 85).  Defendants replied to plaintiffs' Local Rule 56 statement of facts.  (Docket No. 99).  For the reasons that follow, defendants' motion for summary judgment is **granted in part.**

### FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are summarized here after applying Local Rule 56, which structures the presentation of proof at summary judgment.[1]  Plaintiffs' opposition does not conform to Local Rule 56(c), which requires additional statements of fact to be set forth *separately* from the non-movant's opposition to the statement.  Rather than doing so, plaintiffs litter their opposition with additional facts, which are often repeated verbatim in response to several of defendants' proposed statements.  The court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' *separate* statement of facts."  Local Rule 56(e) (emphasis added).   But in light of defendants' meticulous rebuttal of each point, and in the interest of doing substantial justice, I have nonetheless referred to and considered the evidence plaintiffs raise in support of their additional facts despite their technical failure.

### *Knowledge of Party Affiliations*

Hernández stated that he did not know Cabrera's party affiliation.[2]  (Docket No. 66,

---

[1] The rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," CMI Capital Market Inv. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." Mariani-Colón v. Dep't of Homeland Sec., 511 F.3d 216, 219 (1st Cir. 2007).  The penalty for noncompliance is severe: "If the party opposing summary judgment fails to comply with Local Rule 56(c), the rule permits the district court to treat the moving party's statement of facts as uncontested." Id.  Thus, litigants ignore the rule "at their peril." Id.
A motion for summary judgment must be supported by "a separate, short, and concise statement of material facts, set forth in numbered paragraphs, as to which the moving party contends there is no genuine issue of material fact to be tried." Local Rule 56(b).  The opposing party must admit, deny, or qualify the moving party's facts by reference to each numbered paragraph, and may make a separately numbered statement of material facts. Local Rule 56(c).  The moving party may reply and admit, deny, or qualify the opponent's newly-stated facts, again in a separate statement and by reference to each numbered paragraph.  Local Rule 56(d). Any facts supported by citation to record evidence and not properly controverted as described by the rule are deemed admitted. Local Rule 56(e).
[2] Plaintiffs' rejection of this "as [a] contested fact," without citation to any controverting record evidence, is insufficient under Local Rule 56(c); this statement is therefore deemed admitted.

hereinafter "Def. St.," ¶ 7).  Hernández had never met Cabrera, though Cabrera had seen him at PRHTA.  (Def. St., ¶ 41; Docket No. 85, hereinafter "Pl. St.," ¶ 41).  Cabrera does not know whether Hernández knew his affiliation, and never told Hernández his affiliation.  (Def. St., ¶¶ 42-43).

There is conflicting evidence of whether Gomila knew of Cabrera's party affiliation.  In his deposition, Cabrera testified that he had told Gomila his affiliation "within the dynamics of us joking with each other."  (Docket No. 85-1, p. 6).  But in an answer to interrogatories, Gomila denied knowing Cabrera's affiliation.[3]  (Docket No. 66-2, ¶ 7). Cabrera testified that he is "quite expressive" and states his affiliation "without any problems." (Pl. St., ¶¶ 4, 10).

Cedeño stated that he did not know Cabrera's party affiliation.  (Def. St., ¶ 5).  Cedeño never told Cabrera that he knew of his affiliation.  (Def. St., ¶ 28).  Cabrera never told Cedeño what his affiliation was.  (Def. St., ¶ 29).  And Cedeño never told Cabrera his own affiliation. (Def. St., ¶ 30).[4]  Cabrera and Cedeño never discussed "politics."  (Def. St., ¶ 31).

Carrasco stated that she did not know Cabrera's party affiliation.  (Def. St., ¶ 4). Cabrera never told Carrasco what his affiliation was.[5]   (Docket No. 85-1, p. 2).  He never discussed "politics" with Carrasco.  (Def. St., ¶ 11).   On one occasion prior to the NPP administration taking power, Carrasco told Cabrera that she would wait until "her administration" was in power before retiring.  (Pl. St., ¶ 9).

Sonia Vélez ("Vélez") did not know Carrasco's party affiliation.  (Def. St., ¶ 18).  She did not know whether Carrasco knew Cabrera's affiliation.  (Def. St., ¶ 19).  Vélez never witnessed "any action" by Carrasco "against" Cabrera.  (Def. St., ¶ 20).  Vélez does not know whether

---

[3] Answering an interrogatory on behalf of PRHTA, Gomila also averred that PRHTA lacked personal knowledge of Cabrera's party affiliation.  (Def. St., ¶ 8). But there is no foundation for Gomila's knowledge of whether each person whose knowledge could be imputed to PRHTA knew about Cabrera's affiliation.  Therefore, this statement is not supported by competent evidence, and is not entitled to consideration at summary judgment.

[4] Cabrera testified that he believes Cedeño did know his affiliation, but could not recall how that was so. (Docket No. 85-1, p. 7-8; see Pl. St., ¶¶ 5, 28-30).  But as defendants correctly point out, the cited testimony establishes no foundation for Cabrera's personal knowledge of what Cedeño knew or believed, and it is therefore inadmissible.

[5] Plaintiffs also point to Cabrera's testimony that he believed Carrasco did know his affiliation, based on his joking with Luis Sánchez Casanova ("Sánchez") and other coworkers.  But as defendants correctly observe, this is either speculation or hearsay, and is inadmissible in any case.

Gomila knew Cabrera's affiliation.  (Def. St., ¶ 26).  While Vélez did not know Gomila's party affiliation, she was aware that Gomila's position was a "trust position."  (Pl. St., ¶ 27).  Vélez does not personally know Cedeño.  (Def. St., ¶ 32).  Vélez does not know who Cedeño votes for, but once heard him speaking on the radio as an NPP supporter during the PDP administration, criticizing the Highway Authority.  (Pl. St., ¶ 32).  Vélez does not know whether Cedeño knew Cabrera's party affiliation.  (Def. St., ¶ 34).  Vélez does not personally know Hernández or his party affiliation, but knows that he was appointed under the NPP administration.  (Def. St., ¶¶ 44-45; Pl. St., ¶ 45).  She does not know whether Hernández knows Cabrera's party affiliation.  (Def. St., ¶ 46).

Aida Arocho Nieves ("Arocho") does not know whether Carrasco knows Cabrera's party affiliation.  (Def. St., ¶ 52).  She never discussed "politics" with Carrasco.  (Def. St., ¶ 53).  Arocho does not know whether Gomila knows Cabrera's party affiliation.  (Def. St., ¶ 54).  Arocho has never discussed politics with Gomila.  (Def. St., ¶ 55).  Arocho does not know whether Cedeño knew Cabrera's party affiliation.  (Def. St., ¶ 56).  Arocho never discussed politics with Cedeño.  (Def. St., ¶ 57).  Arocho does not know whether Hernández knew Cabrera's affiliation.  (Def. St., ¶ 58).  Arocho never had any kind of conversation with Hernández.  (Def. St., ¶ 59).

Cynthia Rodríguez Vásquez ("Rodríguez") does not know whether Carrasco knew Cabrera's affiliation.  (Def. St., ¶ 64).  She never discussed politics with Carrasco.  (Def. St., ¶ 65).  She does not know whether Gomila knew Cabrera's affiliation.  (Def. St., ¶ 66).  She never discussed politics with Gomila.  (Def. St., ¶ 67).  She does not know Cedeño and has never talked about politics with him.  (Def. St., ¶¶ 68-69).  She has never spoken with Hernández, and does not know whether he knows Cabrera's affiliation.  (Def. St., ¶¶ 70-71).

Plaintiff Rivera never discussed Cabrera's affiliation with Carrasco.  (Def. St., ¶ 12).  Rivera does not know whether Carrasco knew Cabrera's affiliation.  (Def. St., ¶ 13).  Rivera never discussed her own affiliation with Carrasco, never discussed politics with Carrasco, and

does not know Carrasco's affiliation.  (Def. St., ¶ 14-16).  Rivera never discussed Cabrera's affiliation with Gomila.  (Def. St., ¶ 21).  Rivera never told Gomila her own party affiliation.  (Def. St., ¶ 22).  Rivera never discussed politics with Gomila.  (Def. St., ¶ 23).  Rivera does not know whether Gomila knew Cabrera's affiliation.  (Def. St., ¶ 24).  Rivera does not know Gomila's affiliation.  (Def. St., ¶ 25).  Rivera never discussed Cabrera's affiliation with Cedeño.  (Def. St., ¶ 36).  She never discussed politics with Cedeño.  (Def. St., ¶ 37).  She does not know whether Cedeño knew Cabrera's affiliation.  (Def. St., ¶ 38).  She does not know Cedeño's affiliation.  (Def. St., ¶ 39).  Rivera never met Hernández, but knows who he is and saw him occasionally at the Executive Director's office.  (Def. St., ¶ 48; Pl. St., ¶ 48).  Rivera never discussed politics with Hernández, and does not know whether he knew Cabrera's affiliation.  (Def. St., ¶¶ 49, 50).

### The El Nuevo Día Investigation

On April 29, 2009, *El Nuevo Día* published an article listing the salaries of certain PRHTA trust employees; the article stated its source was a "change report" generated by the PRHTA Human Resources Office.  (Def. St., ¶ 76).  Hernández ordered an investigation into the leak.  (Def. St., ¶ 77).  Hernández never targeted any particular employee.  (Def. St., ¶ 78).  Cedeño lacked authority to request an investigation of the leak.  (Def. St., ¶¶ 91-92).

Cabrera told Arocho he was being investigated for the leak.  (Pl. St., ¶ 60).  According to Arocho, Sánchez mentioned that there were rumors Cabrera had leaked the information.  (Pl. St., ¶ 60).  According to Cabrera, Sánchez told him there was an investigation, and said Cedeño had found two witnesses who would testify against him.[6]  (Pl. St., ¶ 78).  But Sánchez also "indicated to" Cabrera that he "had nothing to do with" the first investigation.  (Id.).  Sánchez never told Cabrera he was the "target" of the investigation.  (Def. St., ¶ 93).  In a document dated May 19,

---

[6] Defendants object to Cabrera's account of what Sánchez told him as hearsay.  But "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship." Fed R. Evid. 801(d)(2)(D). Here, it is uncontested that Sánchez was employed by PRHTA, and that he authored a document summarizing his findings in investigating the leak.  (Def. St., ¶ 79).  The matter of Sánchez's investigation into the leak is therefore within the scope of his employment for purposes of the hearsay rule, and Sánchez's statements on the subject may be offered against PRHTA as non-hearsay.

2009, Sánchez summarized his findings after investigating the leak to El Nuevo Día.  (Def. St., ¶ 79).

Regulation Number 02-004, "Standards of Conduct and Disciplinary Measures," provides the formal framework for disciplinary actions.  (Def. St., ¶¶ 82-84).  Sánchez's "Request for Investigation" refers to Regulation Number 02-004.  (Def. St., ¶ 85).  The report did not state that Cabrera was the target of the investigation, and did not exonerate anyone.  (Def. St., ¶¶ 80-81).  César Maldonado interviewed Cabrera and said he was "part of" the investigation, but never said he was the target.   (Docket No. 85-1, p. 17-18).  Cabrera never received any written communication regarding the investigation.  (Def. St., ¶ 88).  He was never reprimanded, and never received any discipline pursuant to the investigation.  (Def. St., ¶¶ 89-90).  On October 7, 2011, the Director of Human Resources certified that the *El Nuevo Día* investigation was dismissed "without any result."  (Def. St., ¶ 87).

Arocho never saw any document naming Cabrera as the target of the leak investigation.  (Def. St., ¶ 95).  Rodríguez did not know anything about the investigation.  (Def. St., ¶ 96).

### *Audit of Cabrera's Appointment*

In Resolution 2010-01, Hernández was vested with authority to review improper personnel appointments.[7]  (Def. St., ¶ 120).  Hernández's audit reached all PRHTA employees.  (Def. St., ¶ 121).  Sánchez directed Rodríguez to give external auditors access to personnel files.  (Pl. St., ¶ 72).  Cabrera does not know the outside auditor's party affiliation, and he does not know whether the auditor knew his affiliation.  (Def. St., ¶¶ 126-127).

Early in the audit, files were processed in alphabetical order, but after some time, Carrasco started ordering Rodríguez to deliver specific individuals' files.[8]  (Pl. St., ¶ 72).

---

[7] Plaintiffs point to page 90 of Cabrera's deposition as evidence of Hernández stating he was sure that his personnel audit would affect both PDP and NPP-aligned employees, but that it would affect a larger number of PDP supporters.  (Pl. St., ¶ 198).  But page 90 is not included in the deposition excerpts submitted by either plaintiffs (Docket No. 85-1) or defendants (Docket No. 66-7).  Since plaintiffs' assertion is not supported by record evidence, it is not entitled to consideration at summary judgment.
[8] Defendants object to this as hearsay.  But Rodríguez's testimony is only relating a command—not an assertion offered for its truth—made by Carrasco; it therefore cannot be hearsay.

Cedeño lacks authority to order an audit or investigation of Cabrera.[9]  (Def. St., ¶¶ 117-118).

On January 26, 2010, Hernández issued a letter stating that he intended to declare Cabrera's appointment null.  (Def. St., ¶¶ 122-123).  Following an informal hearing on May 18, 2010, Hernández adopted a recommendation leaving the January intention letter without effect; Hernández informed Cabrera of this decision by a letter dated July 20, 2011.  (Def. St., ¶¶ 124-125).

### *Access to Cabrera's Personnel File*

Personnel Regulation 02-005 sets forth procedures for reviewing personnel files.  (Def. St., ¶¶ 97-100).  Gomila sent a memorandum on June 18, 2009 designating Carrasco as "the person responsible for control and handling of files."  (Def. St., ¶ 101).

Cabrera requested a copy of his personnel file, in writing, on September 21, 2009.  (Def. St. ¶¶ 102-103).  He paid for this copy on September 28, 2009.  (Def. St., ¶ 104-105).  According to Carrasco, the Human Resources Office could not make copies until proof of payment was received.  (Def. St., ¶ 106).

Cabrera asked to see his personnel file on September 23, 2009.   (Def. St., ¶ 107).  Cabrera testified that another PRHTA employee requested her personnel file immediately after he requested his own.[10]  (Pl. St., ¶ 98).  Cabrera reviewed his file the following day.  (Def. St., ¶¶ 108-110).  Cabrera asked to see his personnel file again on April 16, 2010, and reviewed it the same day in the office of the Assistant Executive Director, in the presence of Gomila.  (Def. St., ¶¶ 111-114).

Rodríguez told Cabrera that Carrasco would let him know when his personnel file would

---

[9] Cabrera testified that Sánchez told him he heard Cedeño tell Hernández that Cabrera's appointment was illegal.  (Pl. St., ¶ 118).  Defendants correctly object that this is hearsay.  While it is undisputed that Sánchez was a PRHTA employee, Fed. R. Evid. 801(d)(2)(D) only reaches statements made during the course of the declarant's employment relationship.  The provided excerpts of Cabrera's testimony do not establish *when* Sánchez told Cabrera about the meeting with Hernández, and therefore cannot bring that statement within the 801(d)(2)(D) exception.  Because no exception clearly applies, and plaintiffs argue for none, I find this statement is not admissible for summary judgment.

[10] Cabrera further testified that the other employee "did not have any problem with seeing her file on the same day"; as defendants point out, however, the testimony does not establish a foundation for Cabrera's personal knowledge of when this co-worker was permitted to review her file.

be reviewable.  (Pl. St., ¶ 17).  Rodríguez did not know how many times Cabrera had requested access to his file, and her only knowledge about his requests for photocopies was that he had mentioned it to her.  (Def. St., ¶¶ 115-116).

### *Access to Human Resources Database*

On January 25, 2010, Sheila Reyes Orta sent a letter to Gomila requesting an investigation of another leak of salary information; Gomila responded with a letter declining to engage in a formal investigation.[11]  (Def. St., ¶¶ 128-129).  Gomila e-mailed the Human Resources employees, informing them that access to the Human Resources database was being blocked, with the exception of Payroll and Leave Section employees, and that she would evaluate exceptions on an as-needed basis.  (Def. St., ¶ 130-131).

Cabrera was one of several employees deprived of access to the Human Resources database and required to provide justifications for further access.  (Def. St., ¶¶ 132, 136).  His supervisor, Sonia Vélez, was also deprived of access, along with Arocho and María Ortiz.  (Pl. St., ¶ 131; Def. St., ¶¶ 134, 137).  On February 10, 2010, Vélez submitted a written request and justification for her and Cabrera to access the database.  (Def. St., ¶ 133).  On February 16, Gomila e-mailed two other persons, asking them to give Vélez and Cabrera access to the database.  (Def. St., ¶ 138).  Cabrera and Vélez were given access to the database again on February 22, 2010.  (Def. St., ¶¶ 140-141).

According to Gomila, her directive applied "evenly to all staff," and was never targeted at Cabrera.  (Def. St., ¶ 144).  According to Vélez, Cabrera's access to the database was restricted and monitored.[12]  (Pl. St., ¶ 26).  Neither Arocho nor Rodríguez knew anything about Cabrera's access to the HR system.  (Def. St., ¶¶ 145-146).

---

[11] Plaintiffs' terse denials "for lack of knowledge as to the authenticity of the document and pertinence" is unavailing.  Gomila's statement regarding both letters provides "evidence sufficient to support a finding that the item is what the proponent claims it is."  See Fed. R. Evid. 901(a); (Docket No. 99-1, ¶¶ 5-7).

[12] Plaintiffs point to Cabrera's testimony that fellow supervisors Arocho and Ortiz were affiliated with parties opposing the NPP.  (Pl. St., ¶ 135).  But as defendants correctly observe, the testimony does not establish any foundation for Cabrera's personal knowledge of the others supervisors' party affiliations.  It is therefore speculative, and not admissible at summary judgment.

### *Reduction in Cabrera's Duties*

Cabrera was appointed as Supervisor of Transactions of Human Resources on September 3, 2008.  (Def. St., ¶ 159).  His formal job description provides, as examples of his work, that he would:  "supervise[] and coordinate[]" appointments, transfers, and so forth; prepare change reports; review information in the documents accompanying each transaction; maintain a register of positions and transactions; and prepare other reports.  (Def. St., ¶ 162).

PRHTA has not made any new regular or career appointments since January 8, 2009, with the exception of an appointment made pursuant to a court order.  (Def. St., ¶¶ 160-161).  Cabrera verified and signed an annual report detailing personnel transactions and accounting for all active employees, on August 12, 2010.  (Def. St., ¶¶ 163-165).  He also verified and signed monthly reports for June 2009, for each month between August 2009 and May 2010, and for July 2010 through May 2011.  (Def. St., ¶ 166).  Cabrera requested a budget certification for a new appointment on May 21, 2009.  (Def. St., ¶ 168).  Cabrera referred another newly appointed employee to the Civil Rights Office and the Retirement Affairs Coordinator on May 26, 2009. (Def. St., ¶ 167).  He requested a budget certification for another employee on June 15, 2009, and initiated the "letter of designation."  (Def. St., ¶ 170).  He requested a budget certification for another employee on June 17, 2009, and referred the employee to the Civil Rights Office and Retirement Affairs Coordinator on July 1, 2009.  (Def. St., ¶ 169).  Cabrera furnished a number of change reports to Gomila on August 3, 2009.  (Def. St., ¶ 173).  Cabrera referred another newly appointed employee to the Civil Rights Office and the Retirement Affairs Coordinator on August 24, 2009. (Def. St., ¶ 171).  He requested a budget certification for another new appointment on August 19, 2009, and forwarded the appointment to the Office of Health Insurance and the Civil Rights Office on August 21, 2009.  (Def. St., ¶ 172). Cabrera referred another newly appointed employee to the Civil Rights Office and the Retirement Affairs Coordinator on September 30, 2009.  (Def. St., ¶ 174).  In October 2009, Cabrera requested a budget certification for another employee.  (Def. St., ¶ 175).  A letter from Vélez to Gomila listed

work that Cabrera's section was expected to perform during the week of November 9-13, 2009. (Def. St., ¶ 176). Cabrera provided status reports on February 4, March 2, and May 7, 2010 detailing work he had been assigned. (Def. St., ¶ 177). Various documents show Cabrera's involvement in the appointment of another employee on June 21, 2010. (Def. St., ¶ 180). He signed a government certification in his capacity as supervisor on June 29, 2010. (Def. St., ¶ 181). He requested a budget certification for another employee's appointment on September 27, 2010. (Def. St., ¶ 182). He drafted a letter of reinstatement for another employee on September 28, 2010, and submitted it to Gomila for her review. (Def. St., ¶ 183). He requested a budget certification for another employee on October 1, 2010. (Def. St., ¶ 185). He requested another certification for a different employee on October 11, 2010. (Def. St., ¶ 184). He requested a certificate of eligibility for another employee on November 4, 2010. (Def. St., ¶ 186). He referred an appointee to the Supervisor of Payroll on November 15, 2010. (Def. St., ¶ 187). He referred another appointee to payroll on December 14, 2010. (Def. St., ¶ 188). On December 14, 2010, Gomila assigned Cabrera to prepare appointments for the Director of the North and East Region. (Def. St., ¶ 189). In January 2011, Cabrera requested a certificate of eligibility and a budget certification for another appointee. (Def. St., ¶ 190). He requested a budget certification for a new appointee, and referred the appointee to the Retirement Affairs Coordinator in early 2011. (Def. St., ¶ 191).

Cabrera testified that he continues to perform "supervisory functions." (Def. St., ¶ 192). Cabrera also said that he "would not supervise the entire process" of appointments, but rather, "be given some transactions strictly for just entering them into the system, and in the redaction or writing of letters." (Pl. St., ¶ 161). Vélez testified that certain technicians were given assignments directly, bypassing Cabrera. (Pl. St., ¶ 176). However, she also testified that Cabrera would supervise their work. (Def. St., ¶ 195). Neither Arocho nor Rodríguez had knowledge of Cabrera being deprived of any job functions. (Def. St., ¶¶ 193-194).

***Cabrera's Workspace***

On October 22, 2009, Gomila wrote a letter to all supervisors informing them that the physical facilities would be reorganized, and that "closed offices" would be reassigned in accordance with Procedure Number 09-06-03. (Def. St., ¶¶ 147-148). The procedure document does not identify "Supervisor" as a rank entitled to a closed office. (Def. St., ¶ 149). Gomila stated that Cabrera was moved to a cubicle for these reasons, and not because of any political animus. (Def. St., ¶ 155). According to Vélez, Cabrera's work space was moved to a space with no privacy, construction debris was left in the middle of the floor, and he no longer had the most direct access from his work area to bathrooms and "ladders"[13] because use of the nearest door was limited to Gomila and one other person by a coded lock. (Pl. St., ¶ 26). Cabrera was later given a cubicle with larger measurements. (Def. St., ¶ 156; Pl. St. ¶ 158).[14]

In a document dated September 2, 2010, a PROSHA inspector found that the exit space from a cubicle was insufficient under safety standards, and that the violation impacted Arocho.[15] (Def. St., ¶ 150-151). A letter dated September 29, 2010 details corrective actions taken with respect to the citation. (Def. St., ¶ 152). On October 22, 2010, PROSHA and PRHTA reached an agreement in which PRHTA admitted noncompliance, but that no penalty would be assessed; this agreement was adopted on November 3, 2010. (Def. St., ¶¶ 153-154). Arocho said that Cabrera told her PROSHA had fined PRHTA, and that she was moved to a bigger space. (Pl. St.,

---

[13] This should probably have been interpreted as "staircases," since both "staircase" and "ladder" can be expressed by the Spanish *escalera*. See A New Pronouncing Dictionary of the Spanish and English Languages 288 (Prentice-Hall revised ed. 1973).

[14] Plaintiffs allege that Cabrera's cubicle "was too small and had to be redone." But the cited deposition testimony only states that Rodríguez thought the cubicle was "quite small," that she did not know what the standards were, and that it was eventually made larger. (Docket No. 85-6, p. 22-23).

[15] Plaintiffs contend that the PROSHA citation pertained to Cabrera's cubicle, citing the depositions of Arocho and Vélez. Vélez only testified, however, that Cabrera was moved to a cubicle, which lacked privacy, and that the area was littered with construction debris. She also testified that an emergency exit door providing the most direct access to stairways and bathrooms from Cabrera's work area was locked. (Docket No. 85-4, p. 26-27). Vélez's testimony simply does not address the PROSHA citation, and thus does not raise an issue of fact regarding what cubicle was found noncompliant.

Plaintiffs also point to Arocho's testimony that she assumed Cabrera's cubicle was altered to meet PROSHA requirements. (Docket No. 85-5, p. 29). But read in context of the preceding questions, Arocho's response is speculative; she earlier admitted that she had never seen the citation, and did not know what requirements were at issue. (See Docket No. 85-5, p. 27-29). Thus, the testimony does not show what plaintiffs offer it to prove: that the cubicle cited by PROSHA belonged to Cabrera.

¶ 60).   Rodríguez testified that PRHTA increased the size of Cabrera's cubicle, and that she believed it was to comply with PROSHA requirements.  (Pl. St., ¶ 72).

### Other Issues

Cabrera has never visited a doctor or psychiatrist in connection with his allegations of discrimination.  (Def. St., ¶ 196).  He testified that he had not done so because he did not wish to use sick leave.  (Pl. St., ¶ 196).  Rivera has never visited a doctor or psychiatrist for treatment related to the matter, either.  (Def. St., ¶ 197).  Rivera never witnessed any acts against Cabrera.  (Def. St., ¶ 51).  Cabrera's salary was not reduced, and he was not moved to a different geographic location.  (Def. St., ¶ 199-200).  His title was not changed.  (Def. St., ¶ 201).

Carrasco was not Cabrera's direct supervisor.  (Def. St., ¶ 17).  Cedeño was not Cabrera's direct supervisor.  (Def. St., ¶ 40).  Carrasco lacked authority to take "any adverse personnel action" against Cabrera.[16]  (Def. St., ¶ 119).  Carrasco retired on April 22, 2011.  (Def. St., ¶ 202).  PRHTA had a written policy regarding equal opportunities for employment, including a statement on political ideology.  (Def. St., ¶¶ 203-204).

Rodríguez does not know whether Gomila, Carrasco, Cedeño, or Hernández have ever taken any actions against Cabrera.  (Def. St., ¶¶ 72-75).  Vélez never witnessed Cedeño engaging in "discrimination" against Cabrera.  (Def. St., ¶ 35).  She never witnessed Hernández engaging in "discrimination" against Cabrera.  (Def. St., ¶ 47). Arocho testified that she did not know whether Gomila, Carrasco, Cedeño, or Hernández had taken any actions against Cabrera.  (Def. St., ¶¶ 60-63).

### Procedural History

Plaintiffs sued in this court on August 5, 2010.  (Docket No. 1).  Prior to filing suit, Cabrera never filed an administrative complaint before PRHTA.  (Def. St., ¶ 1).  Carrasco and Cedeño moved to dismiss the complaint.  (Docket Nos. 12, 13).  Plaintiffs amended the complaint on November 29, 2010.  (Docket No. 24).  Carrasco and Cedeño renewed their

---

[16] Of course, the ultimate question of whether any actions Carrasco took were "adverse personnel actions" requires legal analysis, and is not susceptible to resolution based on her averments alone.

motions to dismiss.  (Docket No. 32).  This court ruled that plaintiffs failed to state claims as to (1) the section 1983 claims brought by Rivera and the conjugal partnership, (2) the section 1983 claims against Carrasco, and (3) the equal protection and due process claims against Cedeño. (Docket No. 100, p. 13).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh the facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Leary v. Dalton, 58 F.3d 748, 751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [evidence] . . . which it believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S. 574, 600 n.22 (1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1).  Once this threshold is met, the burden shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," Leary, 58 F.3d at 751, and an evaluating court may not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." Greenburg v. P.R. Maritime Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).  Nonetheless, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any

essential element of the claim.  Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

<div align="center">

**DISCUSSION**

</div>

In their amended complaint, plaintiffs allege that the defendants (1) violated Cabrera's free speech and free association rights by engaging in political retaliation; (2) violated Cabrera's equal protection rights; (3) violated Cabrera's due process rights; (4) violated an assortment of Puerto Rico statutory and constitutional rights; and (5) injured Rivera and the conjugal partnership as a result of violating Cabrera's constitutional rights.  (Docket No. 24).  In a scattershot motion, defendants seek summary judgment on all claims.  I begin by considering Rivera's standing to sue under section 1983, then proceed to address Cabrera's section 1983 claims for equal protection and due process violations, and for political discrimination, followed by the Law 100, Law 184, and tort claims under Puerto Rico law.  Finally, I address defendants' attack on plaintiffs' requested forms of relief.

## I.     Rivera's Standing Under Section 1983

The defendants argue that Rivera lacks standing to sue under section 1983 because she was not personally injured by any state action.[17]  Standing is a jurisdictional principle based on both "constitutional requirements and prudential concerns," requiring courts to ask "whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts." Pagán v. Calderón, 448 F.3d 16, 26-27 (1st Cir. 2006).  Under the law of this circuit, section 1983 does not provide a cause of action for family members' damages "unless the unconstitutional conduct was aimed at the familial relationship." See Robles-Vasquez v. Tirado García, 110 F.3d 204, 206 n. 4 (1st Cir. 1997) (wrongful death); Ramírez-Lluveras v. Pagán-Cruz, 833 F. Supp. 2d 151, 157-58 (D.P.R. 2011) (collecting cases).

Rivera and the conjugal partnership seek damages "because of [defendants'] intentional

---

[17] Carrasco and Cedeño raised this argument in their motions to dismiss, and I dismissed Rivera and the partnership's putative section 1983 claims accordingly.  I briefly reprise the analysis as to PRHTA, Hernández, and Gomila, none of whom joined the earlier motion.

tortious misconduct and repeated violation *of plaintiff Cabrera de la Mata's constitutional rights*." (Docket No. 24, ¶ 60) (emphasis added). To the extent this was intended as a section 1983 claim, defendants are entitled to summary judgment. However, this analysis has no impact on claims under Commonwealth law, so long as they share a common nucleus of fact with any of Cabrera's remaining federal claims. See Rodríguez-Rios v. Cordero, 138 F.3d 22, 26-27 (1st Cir. 1998).

**II.      Qualified Immunity**

The individual defendants assert that they are entitled to qualified immunity because they "acted, at all times[,] within the established framework of their functions . . . and they neither negligently nor intentionally violated any of [Cabrera's] constitutional rights." (Docket No. 67, p. 33). A public officer is entitled to immunity from suit unless (1) the facts show a violation of a constitutional right, and (2) that right was "clearly established" at the time of the defendant's conduct. Air Sunshine, Inc. v. Carl, 663 F.3d 27, 32-33 (1st Cir. 2011). I will separately address the claims of qualified immunity with respect to each alleged constitutional violation.

**III.     Equal Protection**

Defendants correctly point out the principle that "[a]n equal protection claim alleging political discrimination merely restates a First Amendment political discrimination claim and, as we have said repeatedly, should [be] considered under the First Amendment." See Uphoff Figueroa v. Alejandro, 597 F.3d 423, 430 n. 8 (1st Cir. 2010) (collecting cases). The individual defendants are therefore entitled to qualified immunity, and the PRHTA is entitled to dismissal, because there is no cognizable equal protection claim.

**IV.     Due Process**

With respect to Cabrera's due process claim, defendants correctly observe that Puerto Rico law does not consider job functions to be property interests. (Docket No. 67, p. 9). The right to due process consists of both substantive and procedural guarantees. Pagán, 448 F.3d at 32. To state a procedural due process claim, the plaintiffs "must identify a protected liberty or

property interest and allege that the defendants, acting under color of state law, deprived [them] of that interest without constitutionally adequate process." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006)). Similarly, substantive due process is violated where (1) a defendant's acts are "so egregious as to shock the conscience," and (2) the acts deprived the plaintiff of a protected life, liberty, or property interest. Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011). Local law defines property interests, and "[o]n this point, Puerto Rico law is pellucid: a public employee may have a property interest in his continued employment . . . but not in the particular functions of his job." Rojas-Velásquez v. Figueroa-Sancha, 676 F.3d 206, 212 (1st Cir. 2012).

Here, Cabrera "does not claim to have been deprived of state employment, [his] title, or [his] salary; [he] claims only to have been deprived of duties pertaining to [his] position." See Torres-Martínez v. P.R. Dep't of Corrections, 485 F.3d 19, 24 (1st Cir. 2007). Therefore, the individual defendants are entitled to qualified immunity, and the PRHTA is entitled to dismissal, because Cabrera cannot establish a federal due process violation under his claims.

## V.   Political Discrimination

The core of Cabrera's complaint is that he was subject to a variety of workplace humiliations and inequities because of his allegiance to the PDP. I begin with defendants' challenges to Cabrera's narrative, and then address whether liability may be imputed to PRHTA or the individual defendants, and conclude by revisiting the issue of qualified immunity.

### A.   Specific Episodes

"It is axiomatic that 'the First Amendment protects non-policymaking public employees from adverse employment actions based on their political affiliation or opinion.'" Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 152 (1st Cir. 2006) (quoting González-Piña v. Rodríguez, 407 F.3d 425, 431 (1st Cir. 2005)). A plaintiff bears the burden of showing that "political discrimination was the substantial or motivating factor in a defendant's employment decision." Id. (quoting Cepero-Rivera v. Fagundo, 414 F.3d 124, 132 (1st Cir. 2005)). "Even 'relatively

minor events' can give rise to § 1983 liability . . . so long as the harassment is not so trivial that it would not deter an ordinary employee in the exercise of his or her First Amendment rights." Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011) (citation omitted).  But "even if a plaintiff shows an impermissible political motive, he cannot win if the employer shows that it would have taken the same action anyway . . . ."  Soto-Padró v. Pub. Bldgs. Auth., 675 F.3d 1, 6 (1st Cir. 2012); see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977).  This is an affirmative defense; as such, a defendant cannot prevail at summary judgment "unless the evidence that he provides on that issue is conclusive." See Torres Vargas v. Santiago Cummings, 149 F.3d 29, 35 (1st Cir. 1998).

Defendants attempt to secure summary judgment by controverting his factual account of each episode:  (1) the leak investigation, (2) the PRHTA personnel audit, (3) Cabrera's ability to review his personnel file, (4) deprivation of Cabrera's access to the Human Resources database, (5) deprivation of Cabrera's supervisory duties, and (6) the conditions relating to his cubicle.[18]

### 1.    The El Nuevo Día Leak Investigation

Defendants argue that any claims of discrimination arising out of the El Nuevo Día investigation are either (1) moot because the investigation has since been dismissed, or (2) fail to establish an "adverse employment action" because Cabrera was never the "target" of the investigation.  (Docket No. 67, p. 12).

Defendants' mootness argument is unavailing.  Mootness doctrine stems from the Article III requirement that federal courts only decide cases or controversies, and requires dismissal

---

[18] Defendants also recite the rule of Mt. Healthy, but do naught to apply it to the facts of the case, only stating that: "In the alternative, the documentary evidence submitted with the instant motion demonstrates that the Mt. Healthy defense is applicable to defendants since for each administrative decision taken there is a regulation in support and/or a valid administrative justification, to wit, need of service and/or security reasons, regardless of plaintiff's political affiliation."  (Docket No. 67, p. 26) (formatting in original).  But they wholly fail to articulate which "regulation[s] in support and/or . . . need[s] of service and/or security reasons" cover any particular "administrative decision[s] taken."  Courts do not accept open-ended invitations to consider the voluminous "documentary evidence submitted with the instant motion," since "parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority."  See Velásquez Rodríguez v. Mun'y of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (emphases added).  Moreover, such a spectral afterthought is hardly adequate to put plaintiffs on notice that they must oppose summary judgment on Mt. Healthy grounds as to any particular incident of alleged discrimination.

where "the issues presented are no longer live or when the parties lack a legally cognizable interest in the outcome." Chico Serv. Sta., Inc. v. Sol P.R. Ltd., 633 F.3d 20, 35 (1st Cir. 2011) (quoting Cruz v. Farquharson, 252 F.3d 530, 533 (1st Cir. 2001)).  But a case is not moot unless "an intervening event makes it impossible for the court to grant any effectual relief." Weaver's Cove Energy, LLC v. R.I. Coastal Resources Mgmt. Council, 589 F.3d 458, 468 (1st Cir. 2009) (citations and quotation marks omitted).  Here, plaintiffs seek four forms of relief:  (1) a determination that Cabrera's rights were violated; (2) injunctions forbidding future discrimination, ordering the disclosure of the investigation results, and ordering Cabrera's formal exoneration; (3) awards of compensatory and punitive damages, with interest; and (4) an award of attorney's fees.  (Docket No. 24, p. 15-16).  The fact that the internal investigation was closed (Def. St., ¶ 87) does not make it impossible for the court to provide any relief, since plaintiffs' theories of recovery do not turn on whether the investigation is ongoing or not.  Defendants are therefore not entitled to dismissal on mootness grounds.

Defendants have also failed to show they are entitled to judgment as a matter of law on their version of the facts.  They argue that Cabrera was never a designated target of either Sánchez's preliminary investigation or of the subsequent formal investigation, that he was never presented with any formal communications, and that he was never subjected to disciplinary action.  Without further analysis, defendants summarily conclude that plaintiffs' claim is therefore "meritless and cannot be considered . . . an adverse employment action."  (Docket No. 67, p. 12).  Thus, defendants appear to argue only that the investigation did not *formally* target Cabrera, and that it therefore was not adverse to him.  Answering this point, plaintiffs offer evidence that Sánchez, who prepared a report on the preliminary investigation, had told Cabrera there were witnesses ready to implicate him in the leak.  (Pl. St., ¶ 78).  He also had told Arocho that there were rumors Cabrera had leaked the information.  (Pl. St., ¶ 60).  Plaintiffs' evidence is sufficient to create a genuine dispute as to whether Cabrera was a subject of the investigation. Since this is defendants' only substantive argument against this claim, they are not entitled to

summary judgment.

### 2.      Personnel Audit

Defendants' only argument regarding the audit of Cabrera's personnel file is that his claim is moot "since [Hernández] adopted the recommendation of the Examining Officer and left without effect the letter of intention to declare [Cabrera's] promotion null."  (Docket No. 67, p. 16-17).  As discussed above, claims are only moot when intervening events make it impossible to grant relief.  Weaver's Cove, 589 F.3d at 468.  Since plaintiffs seek, *inter alia*, damages and attorney's fees, the case is not moot, and defendants are not entitled to judgment on this claim.

### 3.      Access to Personnel File

Defendants argue that contrary to the complaint's allegations, there is no evidence that Cabrera's ability to examine his personnel file was ever curtailed.  (Docket No. 67, p. 14-15).  But plaintiffs point to Cabrera's deposition testimony that he recalled an occasion on which he was not permitted to see his file on the same day of his request.  (Docket No. 85-1, p. 21-23).  Since there is evidence from which a jury could conclude Cabrera was not given same-day access to his file, and because defendants do not challenge this claim on any other grounds, they are not entitled to summary judgment.

### 4.      Restrictions on Access to Human Resources Database

Defendants assert that Cabrera was not the only person deprived of access to the Human Resources database, and that his access was restored after Vélez, his supervisor, provided Gomila with a written justification for his continued access to the database.  (Docket No. 67, p. 18-19).  Defendants summarily conclude that this renders Cabrera's claim "groundless."  (Docket No. 67, p. 19).  But without further analysis, defendants have not met their initial burden of informing the court of the legal basis for their position, and are therefore not entitled to summary judgment.[19]  See Crawford-El, 523 U.S. at 600 n. 22.

---

[19] Conceivably, these facts could be deployed to show there is no evidence of political animus, and that Cabrera therefore cannot establish all of the elements of his First Amendment cause of action.  Alternatively, they might be offered to establish the *Mt. Healthy* affirmative defense.  But defendants' failure to perform either of these

### 5.    Stripping of Duties

Defendants argue that contrary to Cabrera's allegations, he continues to perform the tasks pertaining to his position as Supervisor of Personnel Transactions.  To that end, they cite a number of documents evincing Cabrera's work between May 2009 and early 2011, and conclude that Cabrera's claims should be dismissed.  (Docket No. 67, p. 24).  Plaintiffs counter with Cabrera's testimony that he was nonetheless boxed out of supervising "the entire process" of appointments, as well as Vélez's testimony that Cabrera's underlings were given direct assignments over his head.  This is enough to create a triable question as to whether Cabrera's duties were curtailed.  As defendants advance no other arguments pertaining to this claim, they are not entitled to summary judgment on it.

### 6.    Cabrera's Cubicle

Addressing Cabrera's complaints about his cubicle, defendants argue that (1) he was moved there pursuant to a politically-neutral floor-space reorganization plan, and (2) there were never any PROSHA violations pertaining to his cubicle.  To the extent Cabrera seeks any relief based on his cubicle being the subject of a PROSHA citation, defendants have demonstrated that there is no evidence that that ever took place.  But Cabrera points to evidence that his coworkers thought his cubicle was rather small and inconveniently placed, and noticed when it was later enlarged.  (Pl. St., ¶¶ 26, 72, 158).  Because defendants have advanced no argument for why this incident—at least viewed together with the others—would not be actionable, they are not entitled to summary judgment on this ground.

### B.    PRHTA's Liability

PRHTA argues that it cannot be held liable for political discrimination because the complaint only alleges that it had an institutionalized policy of discrimination, and it is uncontested that PRHTA had written policies against political discrimination.  (Docket No. 67, p.

---

analyses deprived plaintiffs of a target for their opposition to focus on.  Were the court to do defendants' work for them, it would effectively be granting *sua sponte* summary judgment without adequate notice.  Cf. Fed. R. Civ. P. 56(f).

27; Def. St., ¶¶ 203-204). Plaintiffs have failed to refute this characterization of their claim, or to identify any other basis on which to impute liability to PRHTA. Cf. Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (describing standards for imputing local government liability under § 1983). PRHTA is therefore entitled to summary judgment on Cabrera's First Amendment claims.

### C.       Knowledge of Political Affiliation

The remaining[20] individual defendants further argue that there is insufficient evidence that any of them knew which party Cabrera was aligned with, and they thus could not have acted on political grounds. (Docket No. 67, p. 25-26). In particular, Hernández, Gomila, and Cedeño each denied knowing what Cabrera's affiliation was. (Def. St., ¶¶ 3, 5-6).

Viewing the record in the light most favorable to plaintiffs, a jury could credit Cabrera's testimony that he recalled joking with Gomila about his party alignment. (Pl. St., ¶ 3). See Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006) (finding adequate evidence for jury finding of knowledge where plaintiff's affiliation was "well-known" within "a relatively small workplace," and one defendant had expressly asked about the plaintiff's affiliation). Though Gomila denies this, a credibility determination is not apt for resolution at summary judgment.

As for Hernández and Cedeño, however, Cabrera's testimony about being an "expressive" supporter of the PDP is too thin to permit a rational inference that they were aware of his allegiances. See González-de-Blasini v. Family Dept., 377 F.3d 81, 85-86 (1st Cir. 2004) (affirming summary judgment where plaintiff had only alleged that she "was a well-known supporter" of the outgoing party, had held a trust position, and was demoted when the incoming party came into power). See also Vásquez-Valentín v. Santiago-Díaz, 385 F.3d 23, 37-38 (1st Cir. 2004), vacated on other grounds, 546 U.S. 1163 (2006) (insufficient evidence of knowledge where plaintiff had once identified herself with opposing party during "routine campaign

---

[20] The political discrimination claims against Carrasco were dismissed for failure to allege that her direct acts or omissions resulted in any constitutional harms. (Docket No. 100); see Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 768 (1st Cir. 2010). Plaintiffs have not sought reconsideration of that ruling.

canvassing," held a trust position for twenty months, and where municipal government employed approximately 1,300 people).

In sum, Hernández and Cedeño are entitled to summary judgment because there is no evidence that they knew Cabrera's political affiliation, and that they therefore discriminated against him on account of politics.[21]   However, there is enough evidence for a jury to find that Gomila knew Cabrera's PDP alignment.  Because she offers no other grounds, she is not entitled to summary judgment.

### D.     Qualified Immunity

For the reasons discussed above, Gomila has failed to show she is entitled to summary judgment on the political discrimination claims, precluding a grant of immunity under the first prong of the qualified immunity analysis.  Moreover, she has neither argued nor shown that the pertinent law against political discrimination was not "clearly established" at the time of the alleged discrimination.  See, e.g., Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 84 (1st Cir. 2006) ("Any reasonable official would clearly understand that it is improper to intentionally violate an employee's First Amendment rights."); Acevedo-García v. Monroig, 351 F.3d 547, 564 (1st Cir. 2003) ("The clearly established law both in this circuit and beyond precludes government officials from discharging civil or 'career' employees for politically-motivated reasons.").  She is therefore not entitled to qualified immunity from Cabrera's First Amendment claims.

## VI.   Employer Liability Under Law 100

Defendants argue that the Law 100 claims against them should be dismissed because PRHTA is not a government agency, and not an "employer" as contemplated by the law.  Law 100 prohibits employers from discriminating against employees on the basis of, among numerous other factors, the employee's political affiliation or ideology.  29 L.P.R.A. § 146.  An "employer" is defined as any person employing laborers, as well as the agents or representatives

---

[21] I therefore need not consider Cedeño's further argument that he lacked authority to take any actions against Cabrera.  (Docket No. 67, p. 26).

of such employers.  § 151(2).  The phrase also includes "all such agencies or instrumentalities of the Government of Puerto Rico as may be operating as private businesses or enterprises."  Id. Reviewing the legislative history, the Supreme Court of Puerto Rico interpreted this phrase to reach the Commonwealth's public corporations:

> The Senate floor debates on Subst. S.B. 331, that later became Act No. 100, reveal that some Senators had doubts about which government instrumentalities were included in the art. 6 phrase, "agencies or instrumentalities of the Government of Puerto Rico [that] operat[e] as private businesses or enterprises." *The phrase was understood to mean public corporations of the government of Puerto Rico*; the Water Resources Authority and the pineapple factory of the Land Authority were specifically mentioned as examples of the government instrumentalities covered by the law.

See Rodríguez Cruz v. Padilla Ayala, 125 D.P.R. 486, 1990 WL 657488 (1990) (emphasis added).

Because the Supreme Court has construed Law 100 to reach public corporations, defendants' unadorned assertion that PRHTA "is not an instrumentality that operates as a private business" is unconvincing.  Therefore, neither PRHTA nor its agents are entitled to summary judgment on this ground.

Defendants argue alternatively that "for the same factual and legal arguments stated above, this Honorable Court should dismiss with prejudice plaintiff's Law 100 claim against appearing defendants."  (Docket No. 67, p. 35).  But the substantive analysis of the statutory claims under Law 100 differs in important ways from that of the constitutional claims under Section 1983 and the First Amendment.  See, e.g., 29 L.P.R.A. § 148 (establishing presumption of unlawfulness in employment actions "whenever the same shall have been performed without good cause.").  Without further analysis, defendants are therefore not entitled to summary judgment on any of the Law 100 claims.

## VII.   Cause of Action Under Law 184

The amended complaint alleges, without elaboration, that the defendants violated Cabrera's rights under Law No. 184 of August 3, 2004, 3 L.P.R.A. §§ 1461 *et seq*.  (Docket No.

24, ¶ 58).  Defendants briefly argue that:

> The PRHTA is a public corporation created pursuant to Law No. 74 of June 23, 1965, as amended. As such, the PRHTA although exempted from the Law No. 184, of August 3, 2004, in personnel administration, is obliged under its own laws and corporate bylaws to adopt a regulation to ensure the merit principle that will govern all personnel transactions. As a matter of fact, the PRHTA adopted a regulation for Personnel on November 6, 1996, Regulation No. 02-005. Therefore, this Honorable Court should dismiss with prejudice plaintiff's state claim under Law No. 184 against the PRHTA.

(Docket No. 67, p. 36).   This position appears to be an oblique reference to 3 L.P.R.A. § 1461e(3), which states that the law "shall not apply" to "[p]ublic or public-private corporations or instrumentalities that operate as private business."   Since public corporations are exempted from Law 184, defendants are entitled to the dismissal of any cause of action under that statute.

**VIII.   Tort Liability**

Defendants seek dismissal of plaintiffs' tort claims under Puerto Rico law, correctly arguing that to the extent Law 100 provides a remedy for discrimination, that remedy is exclusive of any tort claim.  (Docket No. 67, p. 36) (citing Medina v. Adecco, 561 F. Supp. 2d 162, 175-76 (D.P.R. 2008)).   They are therefore entitled to dismissal of any tort claims by Cabrera himself.   But this principle does not dispose of Rivera and the conjugal partnerships' contingent claims, as the Puerto Rico Supreme Court squarely held that:

> [I]n Puerto Rico the relatives of an employee who has been a victim of an Act No. 100 discriminatory treatment at the hands of his employer have a cause of action under Civil Code sec. 1802 to be compensated for the harm resulting from said employment discrimination. In said circumstances, the relatives will recover damages once said discrimination is established.

Santini Rivera v. Serv. Air, Inc., 137 D.P.R. 1, 1994 P.R.-Eng. 909,527 (1994).  Since Cabrera has viable political discrimination claims under section 1983 and Law 100, the defendants are not entitled to dismissal of the contingent tort claims on that ground.

**IX.   Remedies**

Defendants also attack plaintiffs' requests for damages and injunctive relief.  First, under a heading reading "PLAINTIFFS HAVE NOT SUFFERED ANY DAMAGES," they observe

that Cabrera was not deprived of a salary or position, and neither he nor his wife ever sought treatment from a doctor or psychiatrist.  (Docket No. 67, p. 27).  But plaintiffs are not required to either seek medical treatment or offer expert testimony to prove damages.  See also Aponte-Rivera v. DHL Solutions (USA), Inc., 650 F.3d 803, 810-811 (1st Cir. 2011) (affirming remitted verdict in employment discrimination case despite lack of medical expert testimony).  Alternatively, defendants may be arguing that there is no evidence, expert or not, from which a jury could find that the plaintiffs suffered emotional or psychological distress because of discrimination.  But if so, they have argued in such a skeletal manner as to not even satisfy their initial responsibility of demonstrating the absence of evidence on this issue, or of putting plaintiffs on notice of this ground for summary judgment.  Defendants are therefore not entitled to partial summary judgment on the question of damages.

Second, defendants argue that plaintiffs are not entitled to equitable relief.  (Docket No. 67, p. 30-31).  Though they correctly observe that plaintiffs never moved for the entry of a preliminary injunction, their attacks on any final relief are premature.  The grant of injunctive relief is rooted in equity, and is therefore discretionary.  See generally 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2942 (West 1995).  Since the extent of defendants' liability, if any, has not yet been established, I find it would be both inappropriate and impermissibly advisory to rule on the availability of equitable relief at this time.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**  The court **DISMISSES WITH PREJUDICE** the following: (1)  all Section 1983 claims by Rivera; (2) all Equal Protection Clause and Due Process Clause claims; (3) all First Amendment claims against PRHTA, Hernández, and Cedeño; (4) all claims under Law 184; and (5) all tort claims by Cabrera.  Defendants' motion for summary judgment is **DENIED** as to:  (1) Cabrera's First Amendment claims against Gomila; (2) Cabrera's Law 100 claims against all defendants; (3) Rivera and the conjugal partnership's tort claims against all

defendants; and (4) the availability of damages or equitable relief on any remaining claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of June, 2012.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge